UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

STEPHANIE ELIZABETH GARCIA,
*et al.*,

  Plaintiffs and Counter-Defendants,

v.

KEVIN JAY DYKSTRA,

  Defendant and Counter-Plaintiff,

and

FRUITPORT CHARTER TOWNSHIP,
*et al.*,

  Defendants.
_____/

Case No. 1:05-CV-534

Hon. Richard Alan Enslen

**OPINION**

This matter is before the Court to consider two legally related matters: Defendants Paul

Smutz, Jason Christian Pavlige, and Fruitport Charter Township's Motion for Summary Judgment

and the Court's independent Order to Show Cause as to why this case should not be dismissed.

These  matters are have been fully briefed such that oral argument is unnecessary. *See* W.D. Mich.

L.Civ.R. 7.2(d).

**FACTUAL BACKGROUND**

This suit was originally filed by Plaintiffs Stephanie Elizabeth Garcia, Joel Garcia, Christina

Smith and Brian Smith under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth

Amendments to the United States Constitution and under state law.  Plaintiffs have since conceded

the dismissal of the Fourteenth Amendment claims, but not the other claims. (Objs. to Dismissal 1.)

As such, the Court will interpret the summary judgment record and pleadings in a light most favorable to Plaintiffs.

This suit arises from a beleaguered sale of a lawn care business from Defendant Kevin Jay Dykstra to Plaintiffs.  According to Plaintiffs, the sale contract, by Plaintiffs' own admission, misstated the consideration paid on the contract as one dollar, even though $16,000 was transferred in connection with the transaction.[1]  (*See* Am. Compl. ¶ 27.)  The other circumstances surrounding this transaction show it to be a highly unusual one–suspicious in character and likely to promote, as it has, disagreements about the legal interests of the parties involved.  More particularly, it is admitted that the purchase of the assets was made by Stephanie Garcia, rather than Joel Garcia, because he was contemplating bankruptcy. (S. Garcia Dep. 18.)  The purchase was funded by Brian Smith, but Smith was not part of the purchase agreement, because the seller, Defendant Dykstra, disliked Smith and would have not sold to him.  (Joel Garcia Dep. 48.)

This Agreement itself, on top of the confusion created by the false persona and false price,[2] was vague as to the assets being transferred.  The Agreement did not contain a standard inventory of the assets being transferred, but instead relied on the general description in the Agreement, which

---

[1]The Order to Show Cause referred to the contract as a fraudulent one because the consideration was misstated significantly.  Of course, the fraud would not be perpetrated on the parties to the contract, but would potentially affect third-parties, including governmental taxing authorities.  *See Kearney v. Jandernoa*, 957 F. Supp. 116, 121 (W.D. Mich. 1997) (stating that a disparity in value between the actual and stated consideration is corroborating evidence of fraud). Plaintiffs admit in their Objections that the consideration was misstated in the Agreement because of Dykstra's desire to avoid transfer taxes. (Objs. to Dismissal 3.)

[2]When an agreement fails to state the true amount of funds changing hands, it subjects both sides to a risk that there will be a later disagreement as to what was the "actual consideration."  Ordinary contracts avoid such uncertainty, and the swearing contests they invite.

said that Stephanie Garcia was purchasing "the following business, True Cuts Lawn Care, LLC, from

Kevin Dykstra, a single man residing at 2815 Alder, Fruitport, Michigan, 49415 . . . ." (Purchase

Agreement ¶ 1.)  The assets transferred were described as "name of business, . . . ., goodwill of said

business, all client lists[,] [and] . . . assets (whatever kind is located at said location, if any) . . . ."

(*Id.* ¶ 2.)  The transfer clause does contain an exclusion for "real property, buildings, or items of such

kind[,]" *id.*, which would apply to Dykstra's house, but made no attempt to distinguish between the

personal property which Dykstra was transferring in connection with the business sale and that which

he was retaining for his personal use.[3]

Another legally troublesome point about the sale was the inclusion of a trailer in the deal.

Plaintiffs took a trailer away from the transaction which was titled to Dykstra.  (*See* Am. Compl. ¶

37, stating that "the allegedly stolen trailer was not stolen but sold to Stephanie Elizabeth Garcia on

October 12, 2004[.]" [the date of the Purchase Agreement].)  The title was never transferred to the

buyer, which made the entire transfer void  under Michigan law.  (*See* Order To Show Cause,

explaining operation of Michigan's title provisions.)  In answer to these points, Plaintiffs now claim,

without any motion to amend this allegation, that the sale transaction did not include the trailer

because it was not titled to the lawn care company.[4]  (Objs. to Dismissal 14.)  This argument

overlooks not only Plaintiffs' own allegations, but the purpose of the Agreement to convey the trailer

---

[3]The reference to Dykstra's personnel residence also confuses the issue somewhat. According to Plaintiff Brian Smith, the business property was removed by him from a Brooks Road business address with the exception of a dump truck which Smith picked up from Dykstra's personal residence.  (B. Smith Dep. 8-9.)

[4]This is an interesting argument because it contains a tacit admission that Plaintiffs were in wrongful possession of the trailer, but seeks to preserve a claim to the remainder of the sale property.

and other business property, the Agreement language ( which included all personal property of business use at the sale location), and the parties' course of dealing (which involved the transfer of the trailer).  As such, the Court determines as a matter of law that the sale transaction intended the transfer of the trailer and that the entire sale transaction was void as a matter of Michigan law due to the failure to transfer title to the trailer.

This determination does not end the Fourth Amendment inquiry, though, because according to Plaintiffs' allegations, which the Court accepts as true, the Fourth Amendment violation included personal property of Plaintiffs (golf clubs, *etc.*) apart from the void sale assets.  (*See* Objs. to Dismissal 14; Am. Compl. ¶¶ 92-94.)  Relating to such property, the history of Defendant Dykstra's use and seizure of the property requires some discussion, regardless of the minor value of such property.

When the sale was completed, according to Plaintiffs, Dykstra reported to the Fruitport Police Department that Plaintiffs had stolen certain of the property which was the subject of the sale.  (Am. Compl. ¶ 30.)  These allegations were investigated, but not prosecuted since the dispute was deemed civil, not criminal, in nature.  (*Id.* ¶¶ 34-35.)

Dykstra also reported the "purchased" trailer as stolen in April 2005.  (*Id.* ¶ 36.)  This resulted in Plaintiff Brian Smith being charged with receiving or concealing stolen property having a value of more than $200, but less than $1,000. (*Id.* ¶¶ 40-41.)  The same charge was later dismissed by motion of the prosecutor because the ownership dispute was civil in nature.  (*Id.* ¶ 42.)

In July 2005, Plaintiffs were keeping the lawn business property and some personal property at a storage unit.  The unit was leased solely by Brian Smith. (J. Garcia Dep. 17.)  On July 15, 2005, Dykstra observed Smith's unit open with his "stolen" tools inside of it, and called police to report

the "stolen" property.  (Am. Compl. ¶ 44; Defs.' Summ. J. Br., Ex. U; K. Dykstra Aff. ¶ 9.)  Later

that day, Dykstra's wife rented a locker from the storage facility.  (Am. Compl. ¶ 45.)

On July 17, 2005, Fruitland Police received a telephone call that Dykstra was following the

caller's vehicle.  (Defs.' Summ. J. Br., Ex. U.)  At the time, Dykstra had parked his vehicle outside

the storage lot and was videotaping Smith's storage unit.  (*Id.*)  Dykstra explained the underlying

controversy to the officer, who then called the lot owner, Jerry Lundberg.  (*Id.*)  During this time

period, Dykstra had parked his truck outside the storage facility to discourage the removal of the

"stolen" property from the lot.  (*Id.*)  Lundberg was unconcerned about the truck.  (*Id.*)  However,

problems between Smith and Dykstra continued that day and at 6:15 p.m., a police officer was called

and Lundberg told Dykstra to remove himself from the lot.  ((Defs.' Summ. J. Br., Ex. W.)

On July 18, 2005, Dykstra contacted Ron Cooper (a Township Trustee), to request a

telephone call from the Police Chief, John Smutz.  (Dykstra Aff. ¶ 10.)  According to Dykstra, Smutz

told him that he was going to get a search warrant, but failed to do so.[5]  (*Id.* ¶ 11.)  Regardless,

Smutz later called Dykstra to tell him that a peace officer would be made present while he retrieved

the tools.  (*Id.* ¶ 12.)  According to Dykstra, Smutz also reassured that he would not be prosecuted

for removing his personal property from the unit.  (Dykstra Dep. 93-99.)  The removal of the

property was made possible by a fortuity–the key for Smith's unit was left outside the unit, which

fortuity had been reported to Dykstra by Wayne Kamp.  (*Id*. 37-40.)  Smutz then went to the unit

to double-check that the key was there, that it worked with the lock, and that the tools described were

---

[5]Smutz says that this version of the facts is false since he believed the unit to be leased to
Dykstra.  However, the Court accepts Dykstra's version of events, for the purposes of Rule 56,
because it favors the non-movants.

inside. (Smutz Dep. 100-01.) Smutz then called Dykstra to tell him that police dispatch would send out a peace officer to prevent disturbance. (*Id.* 101-02.)

About the same time, Smutz  called officer Jason Pavlige to inform him that he was being sent on a "peace officer complaint" to prevent violence from breaking out while Dykstra retrieved the property he represented to be his own.  (Pavlige Dep. 13-14.)  Dykstra also called the Department, and Central Dispatch relayed to Pavlige that he should meet Dyksra at the storage lot. (*Id.* 22-23.)  Dykstra met him there with two carloads of assistants. (*Id.* 24-25.)  Dykstra did not go onto the secure storage lot, but sent his associates to retrieve the property. (*Id.* 27, 36.)  Dykstra opened the gate for the officer and his associates using the security code given to his wife. (*Id*. 33; Am. Compl. ¶ 68.)  One of his associates then entered the secured lot and used the key to Smith's unit to open the side door of the unit (while Pavlige stood by outside the unit). (Pavlige Dep. 36-37.) During this time, Dykstra's associates entered the unit from the side door and retrieved property. (Id. 38-39.)  Pavlige did not observe anything inappropriate during the property retrieval. (*Id.*)  The property removal lasted some twenty-six minutes and then Pavlige left.  (*Id.* 38-39.)

On the next day, Brian Smith and Joel Garcia attempted to report a breaking and entering of the storage unit.  (Am. Compl. ¶¶ 80-82.)  Two responding Fruitport police officers did not take a report, however, allegedly due to the instructions of Smutz.  (*Id.*)  According to Plaintiffs, at that time the western door of the unit was missing its lock and appeared damaged, and the eastern door was also damaged consistent with forced entry. (*Id*.)  Also according to Plaintiffs, Dykstra's helpers removed not only business property, but also personal property such as golf clubs and video games. (*Id.* ¶¶ 92-94.)

## LEGAL STANDARDS

Defendants' Motion is brought pursuant to Federal Rule of Civil Procedure 56.  Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate.  *Celotex Corp.*, 477 U.S. at 323.

In assessing evidence, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions.  *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994).  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor.  *Celotex Corp.*, 477 U.S. at 323 (quoting *Anderson*, 477 U.S. at 255).  The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**LEGAL ANALYSIS**

**1.  Federal Law Claims**

As stated above, Plaintiffs have narrowed their section 1983 claims to those claims arising under the Fourth Amendment for the invasion of the storage unit on July 18, 2005.

Regarding the Fourth Amendment, although all the Plaintiffs appear to have jumped onto the Fourth Amendment bandwagon, it is equally clear that only one of them, Brian Smith, has standing to pursue such a claim because he was the sole lessor of the rental unit. *See United States. v. Abdullah*, 162 F.3d 897, 902 (6th Cir. 1998) (holding that lessee of unit lacked a reasonable "expectation of privacy" after the expiration of the lease period); *accord United States v. Reyes,* 908 F.2d 281, 285-86 (8th Cir. 1990).   As explained above, Plaintiff Brian Smith's claims are further limited to claims for lost personal property because the business sale transaction was void as a matter of state law.

To succeed under title 42 U.S.C. § 1983, a plaintiff must show not only that a violation of a federal constitutional right (in this case, the Fourth Amendment), but also that the violation was by a "person acting under color of state law." *Wolotsky v. Huhn,* 960 F.2d 1331, 1335 (6th Cir. 1992) (citing cases).  In this case, all Defendants are private parties with the exception of Smutz, Pavlige and Fruitport Charter Township.

Regarding Fruitport Charter Township, the Township does not have liability under section 1983, unless the conduct of its officers was dictated by either an actual or de facto policy of the Township. *See also Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978); *Gregory v. Shelby Cnty.,* 220 F.3d 433, 442 (6th Cir. 2000) (citing cases).  Plaintiffs essentially concede this issue in that they do not object to the dismissal of the claims against  Fruitport Charter Township.  (Br. in

Resp. to Defs.' Mot. for Summ. J. 1, 25.)   Accordingly, those claims will be dismissed with

prejudice.

Regarding the claims against the individual officers, there are two separate issues–whether

the conduct at issue constitutes a violation of the Fourth Amendment, and also whether a reasonable

officer at the time of the conduct would have known that the conduct was in violation of the Fourth

Amendment such that the officer was not protected by qualified immunity.  The following analysis

assumes that the conduct was in violation of the Fourth Amendment and also that the claims against

the officers in their individual capacity were sufficiently alleged in the Amended Complaint.[6]

In *Dunnigan v. Noble*, 390 F.3d 486, 490-91 (6th Cir. 2004), the Sixth Circuit Court of

Appeals summarized the protections afforded by "qualified immunity" as follows:

> "Qualified immunity is a government official's 'entitlement not to stand trial or face the other
> burdens of litigation.' " *Saucier v. Katz,* 533 U.S. 194, 200 . . . (2001) (quoting *Mitchell v.
> Forsyth,* 472 U.S. 511, 526 . . .(1985)).  Such immunity is " 'an expression of policy
> designed to aid in the effective functioning *491 of government.' " *Scheuer v. Rhodes,* 416
> U.S. 232, 242 . . . (1974) (quoting *Barr v. Matteo,* 360 U.S. 564, 572-73 . . .(1959)). Implicit
> in the qualified immunity doctrine is a recognition that police officers, acting reasonably,
> may err. *Id.*  The concept of immunity thus acknowledges that "it is better to risk some error
> and possible injury from such error than not to decide or act at all."  *Id.*
>
> In *Saucier,* the Court carefully delineated a two-fold inquiry to determine an officer's
> entitlement to qualified immunity in the context of an excessive force claim:
>
>> A court required to rule upon the qualified immunity issue must consider ⋯ this
>> threshold question: Taken in the light most favorable to the party asserting the injury,
>> do the facts ⋯ show the officer's conduct violated a constitutional right?  This must
>> be the initial inquiry–
>>
>> [I]f a violation could be made out on a favorable view of the parties' submissions, the
>> next, sequential step is to ask whether the right was clearly established.  This inquiry,

---

[6]The Court actually finds to the contrary on both issues for the reasons argued by
Defendants.  Although these findings are not essential to this disposition, they otherwise support
it.

> it is vital to note, must be undertaken in light of the specific context of the case, not
> as a broad general proposition ····
>
> *Id.* at 201, 121 S.Ct. 2151.  In other words, where a constitutional violation exists, an
> officer's personal liability turns on the "objective legal reasonableness" of the action *in view
> of the circumstances the officer confronted assessed in light of "clearly established" legal
> rules. Id.* at 202 . . .; *Anderson v. Creighton,* 483 U.S. 635, 639 . . . (1987).

*Id.* (footnotes omitted).

In this case, the police conduct was essentially identical to that held to be constitutional in

*United States v. Coleman*, 628 F.2d 961 (6th Cir. 1980).  In *Coleman*, as in this case, the police acted

on a citizen's request to stand by during a property repossession to prevent violence.  *Id.* at 962.  In

*Coleman*, the Circuit held that even assurances of non-prosecution coupled with the police presence

were insufficient to transform the private seizure by the private actors into a Fourth Amendment state

seizure.  *Id.* at 963-64.  The Sixth Circuit also held in such cases as *United States v. Salgado*, 250

F.3d 438, 456 (6th Cir. 2001) that the mere insertion of a key in a lock does not constitute a search.

Such caselaw, when read together, suggests that the conduct of officers Smutz and Pavlige was

perfectly lawful.  Furthermore, even assuming that the conduct was unconstitutional, because Smutz

looked into the unit to confirm the presence of tools,[7] the rule of qualified immunity should operate

in this instance due to the similarity to *Coleman* and *Salgado*.  A reasonable officer informed of the

pertinent caselaw would not have known at the time that the conduct was in violation of the Fourth

Amendment.  The Court reaches this ruling without apology because the public interest in "peace

officer calls" is an especially important one and works to prevent violence and injury.  Indeed, the

---

[7]The Court determines in the limited instance that the look inside is done to facilitate a
"peace officer visit" (as in this case), the "search" is not unlawful under the Fourth Amendment.
A contrary result would be reached if the conduct of the officers was directed toward uncovering
evidence of a crime, a circumstance this record contradicts.

record shows that the police responded to requests for assistance by both Brian Smith and Kevin

Dykstra, and that the police intercession was successful in preventing violence on both occasions.

For the above reasons, Defendants are entitled to summary judgment as to all of Plaintiffs'

section 1983 claims, which claims should be dismissed with prejudice.

### 2.  State Law Claims

Title 28 U.S.C. § 1367(c)(3) authorizes the dismissal of supplemental state law claims, upon

dismissal of federal law claims.  This provision of law is intended to preserve comity between the

state and federal courts, which is a traditional aspect of our federal system.  *See United Mine*

*Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89

F.3d 1244, 1254 (6th Cir. 1996).  Upon due consideration of the interests of the state courts in

resolving state law controversies, the Court determines in its discretion that it should decline to

exercise jurisdiction over the remaining state law claims.  As such, those claims, including

counterclaims, will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

### CONCLUSION

For the reasons given, summary judgment shall be granted as to all federal claims, and all

state law claims will be dismissed without prejudice because the Court declines to exercise

jurisdiction over such claims.

                                     /s/ Richard Alan Enslen
DATED in Kalamazoo, MI:              RICHARD ALAN ENSLEN
     August 23, 2006                 SENIOR UNITED STATES DISTRICT JUDGE